UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| PAMELA CADENHEAD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 05 C 3929 |
| v. | ) | |
| | ) | Magistrate Judge Cole |
| MICHAEL J. ASTRUE, Commissioner | ) | |
| of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

The plaintiff, Pamela Cadenhead, seeks review of the final decision of the Commissioner ("Commissioner") of the Social Security Administration ("Agency") denying her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"), 42 U.S.C. § 423(d)(2). Ms. Cadenhead asks the court to reverse the Commissioner's decision and award benefits, or remand the decision for further proceedings. The Commissioner seeks an order affirming the decision.

## I.

## PROCEDURAL HISTORY

Ms. Cadenhead applied for DIB on December 9, 1995, alleging that she had been disabled since January 1, 1995, due to emphysema, arthritis, and migraines. (Administrative Record ("R.") 144-46).[1] Notably, her disability insured status expired on December 31, 1995. (R. 112). Her application was denied initially and upon reconsideration. (R. 116-18, 123-25). Ms. Cadenhead continued pursuit of her claim by filing a timely request for hearing on August 5, 2005. (R. 126).

---

[1] It appears that she has also asserted her onset date as January 1, 1993. (R. 377).

An administrative law judge ("ALJ") convened a hearing on December 11, 2000, at which Ms. Cadenhead, represented by counsel, appeared and testified. (R. 29-111). In addition, Dr. Irving Zitman testified as a medical expert, and Grace Gianforte testified as a vocational expert. (R. 29). On July 27, 2001, the ALJ issued a decision finding Ms. Cadenhead not disabled because she did not have a severe impairment prior to the expiration of her insured status. (R. 21). Ms. Cadenhead challenged the decision in federal court, and the Commissioner stipulated to an order reversing and remanding the matter on May 20, 2002. (R. 328-30). The order stated that:

> on remand, the [ALJ] will re-evaluate the finding that Plaintiff does not have a severe impairment prior to her date last insured of December 31, 1995. The ALJ will evaluate the opinions of Dr. Evan McLeod that are contained in the record and recontact Dr. McLeod to request that he provide reasons for his conclusions. Additionally, the ALJ will obtain supplemental evidence from a medical expert and Plaintiff will be given an opportunity to submit additional evidence and appear at a hearing.

(R. 331).

The ALJ convened the hearing on remand on July 22, 2003. Ms. Cadenhead again appeared with her attorney, and Ms. Gianforte reprised her role as vocational expert. (R. 420-72). There was a new medical expert, Dr. William Buckingham. (R. 420). The ALJ then conducted a supplemental hearing three months later, on October 24, 2003. (R. 473 -567). Aside from Ms. Cadenhead and counsel, there was a new cast: Dr. James McKenna, appeared as medical expert, and Julie Bose appeared as vocational expert. (R. 473). But, as it turned out, given the record compiled at the two prior hearings, their testimony was not taken. Also, Ms. Cadenhead's husband and son, John and Lance Cadenhead, appeared and testified. (R. 473).

On January 15, 2004, the ALJ issued another decision denying Ms. Cadenhead's application for disability benefits. (R. 311-24). This time, he found that Ms. Cadenhead was engaging in

2

substantial gainful activity ("SGA") before the expiration of her insured status, which disqualified her from receiving disability benefits. (R. 324). He went on to also conclude that she did not have a severe impairment, as he had in his original decision. (R. 324). And he made the additional, alternate finding that she could return to her past work. (R. 324). This became the final decision of the Commissioner when the Appeals Council denied Ms. Cadenhead's request for review of the decision on April 28, 2005. (R. 302-303). *See* 20 C.F.R. §§ 404.955; 404.981. Ms. Cadenhead appealed that decision to the federal district court under 42 U.S.C. § 405(g) and, on April 1, 2009, the parties consented to the jurisdiction of a Magistrate Judge pursuant to 28 U.S.C. § 636(c).

## II.
## EVIDENCE OF RECORD

### A.
### The Vocational Evidence

Ms. Cadenhead was born on July 1, 1945, making her fifty years old when her insured status expired. (R. 144). She spent twelve years as a contracts manager at the University of Chicago until 1991, and from 1994 to 2000, she owned and operated her own business: a pizzeria. (R. 195). Both of these jobs required very little lifting – no more than ten pounds. (R. 188-89). The contracts manager job was performed almost entirely while sitting, while her work at the pizza place involved about equal amounts of sitting and standing. (R. 188-89). Unfortunately, it would appear that her pizza business generally lost money. (R. 103, 149, 152-59). As Ms. Cadenhead explained it:

> I did take a significant loss on the, on the business. But it had really – just because it had become impossible for me to do. And the longer I stayed, the more in debt I was getting.

(R. 103).

**B.**
**Medical Evidence**

Ms. Cadenhead , who asserts that her main problem is emphysema, has been a smoker since 1964. (R. 246). As often occurs in these cases, the medical record is a jumble of barely legible scribblings, cobbled together in no particular order. Moreover, it contains very little evidence from the time prior to the expiration of Ms. Cadenhead's insured status. A treatment note from February of 1991 indicates that Ms. Cadenhead was complaining of wheezing and vomiting, and that there were mild rhonchi in her chest. (R. 281). She complained of migraines in September 1992, and the exam at that time noted her chest was clear. (R. 404). She had a sore throat with a "somewhat productive cough" in June 1993, and examination revealed that her lungs were clear. (R. 241). At a "routine checkup" in September of 1994, Ms. Cadenhead had no complaints other than acne, and her lungs were again clear. (R. 240). On May 12, 1995, Ms. Cadenehad got a prescription for Motrin for headaches, and about a month later, on June 9th, that was changed to Naprosyn as she continued to complain of headaches. (R. 236). She had no cold symptoms or upper respiratory problems, however, and her lungs were clear. (R. 236). She cancelled an appointment for December 28, 1995, due to working at the pizza place. It was rescheduled for a few days later, at which time she said she had some soreness in her right elbow from lifting. Her lungs were, again, clear. (R. 234). That is the extent of the medical record prior to the end of Ms. Cadenhead's insured status.

There is no further medical evidence until January 1997. An essentially illegible note indicates Ms, Cadenhead complained of a cold, and it may include a diagnosis of URI – upper respiratory infection. (R. 232). The following January, Ms. Cadenhead complained of a cold again. (R. 231). She returned in February, once more complaining of cold symptoms. (R. 230). The note

– again, hardly legible – appears to suggest, "Emphysema/URI . . . getting better." (R. 229). She underwent thoracic diagnostic imaging on February 4. 1998. The results were:

> Heart, mediastinum and pulmonary vascular markings are normal. Lungs are clear. There is mild hyperinflation. . . . which could be due to mild emphysema. Otherwise negative chest. There is no significant change from prior examination of 2-26-91

(R. 276). She next underwent a pulmonary function study on February 15th. Forced vital capacity was 1.48 liters; one second forced expiratory volume was 0.73 liters. (R. 246). The study "reveal[ed] a severe obstructive ventilatory pattern." (R. 246). There was "significant improvement following inhaled bronchodilators." (R. 246). In addition, lung volumes demonstrated "air trapping" and "diffusing capacity [was] markedly reduced." (R. 246). The findings were deemed consistent with severe emphysema. (R. 246).

There was a follow-up test done on March 1, 1998. Forced vital capacity was 1.38 liters; one-second forced expiratory volume was 0.69 liters. (R. 245). The study was said to "reveal a severe obstructive ventilatory pattern." (R. 245). Again, bronchodilators offered improvement, and there was air trapping. (R. 246). In short, "[t]here was no significant change" from the prior study. (R. 245).

In May of 1998, Ms. Cadenhead had an examination with Dr. McLeod. He noted that she had experienced "several years of mild dyspnea, worse when the humidity was high . . . ." (R. 224). He added that, "[e]vidently, her chest x-ray was clear." (R. 224). He also noted that she had recently stopped smoking to coincide with her treatment, and started on inhalers. (R. 224). She demonstrated diminished "breath sounds and expiratory volume with forced exhalation." (R. 224). Ms. Cadenhead continued regular followups for her condition. (R. 206-220). Another pulmonary function study on May 26, 2000, was "consistent with severe emphysema." (R. 271). Airflow

5

obstruction was greater than the previous test. (R. 271).

Ms. Cadenhead apparently injured her back in mid- to late-2000. (R. 38, 272, 387). An x-ray and an MRI were performed on Ms. Cadenhead's lumbar spine on September 1, 2000. The x-ray showed mild compression deformity of L3 vertebral body and of superior aspect of L2 vertebral body with sclerosis of bone. (R. 268). The MRI revealed "[r]ecent simple benign compression fractures of the superior aspects of L2 and L1 . . . without encroachment on the central canal . . . [and] old mild simple compression deformity of the L3 vertebral body." (R. 269-70). Dr. Leslie Scaffer, a neurologist, examined Ms. Cadenhead, and recommended a thoraco-lumbosacral brace to allow the compression fractures to heal and physical therapy. (R. 272).

Dr. Evan McLeod completed a residual functional capacity ("RFC") form that Ms. Cadenhead's attorney provided on January 5, 2001. Dr. McLeod opined that she could only occasionally lift less than 10 pounds and was limited in pushing and pulling in her upper and lower extremities. (R. 292). He also thought that Ms. Cadenhead could only stand/walk for less than 2 hours day also noting that this was very limited: walking 100 feet slowly once or twice a day, including repeated resting during this action. (R. 292). Further, he said that she must alternately sit and stand to relieve pain and was limited in gross manipulation due to her spine fractures. (R. 292-294). This condition also limited her ability to stoop. (R. 292, 294). Her emphysema restricted her ability to climb, kneel and crawl – she had difficulty breathing in those positions. (R. 293). Dr. McLeod concluded by saying that "Ms. Cadenhead has very severe emphysema. This is a gradually progressive disease related primarily to her cigarette smoking and has certainly been present for over 10 years." (R. 298). In this context, it is worth noting that, when Dr. McLeod first saw Ms. Cadenhead *three* years earlier in May of 1998, he characterized her condition as "mild." (R. 224).

Dr. McLeod further elaborated on his evaluation in a letter dater August 16, 2001. He explained that her severe emphysema "was documented by pulmonary function testing done on 2/15/98. (R. 301). He indicated that he based his evaluation on his experience as a pulmonary medicine specialist: "I have no doubt, based on my knowledge of the natural history of emphysema, that Ms. Cadenhead had severe emphysema in 1995 and most certainly would have qualified for disability with a FEV 1 less than one liter." (R. 301). This is a significant change from his 1998 assessment.

Another RFC was completed by Dr. LaVerne A. Currie on October 24, 2003. (R. 406-413). Dr. Currie felt that Ms. Cadenhead could occasionally and frequently lift less than 10 pounds. (R. 407). She could stand/walk less than 2 hours in a work day and sit less than 6. (R. 407). These limitations resulted from a combination of her pulmonary and back impairments. (R. 407). Her back impairment also limited her upper and lower extremities when pushing and pulling. (R. 407). The doctor noted that Ms. Cadenhead suffered fatigue from her emphysema and experienced muscle fatigue from radiculopathy and subsequent muscle weakness caused by multiple vertebral fractures. (R. 407). Dr. Currie also explained that lifting, pushing, pulling, and reaching caused severe pain and would place Ms. Cadenhead at high risk for further fractures, nerve compression, and paralysis. (R. 407). Further, Dr. Currie opined that her muscle weakness and severe back pain contribute to complete postural limitations. (R. 408). Environmental limitations required her to avoid all exposure to cold, heat, wetness, humidity, vibration, fumes, odors, dusts, gases, poor ventilation, and hazards. Dr. Currie explained that extremes of temperature, wetness, and humidity would aggravate Plaintiff's emphysema, osteoporosis, and fractures. (R. 410). Fumes would also aggravate her breathing and machinery, heights, etc. place her at risk for further injuring her spine. (R. 410).

7

## C.
## Administrative Hearing Testimony

### 1.
### Plaintiff's Testimony

Ms. Cadenhead did not prove to be a particularly informative witness. Her first hearing, in 2000, focused on two issues: what was her breathing impairment like prior to 1995, and what was she doing at work during that time. Ms. Cadenhead claimed that, prior to 1995, she was never so sick and that she didn't think she'd get better. (R. 44). She said she could not say when she first became sick. (R. 49). She just asserted that she "had a flu-like kind of condition for years." (R. 49). She further claimed that, in order to treat it, she went to the doctor "at least once a month." (R. 44). She "was just going back to the doctor, and back to the doctor, and back to the doctor . . . ." (R. 44). And she said she "always went to the doctor with the same kind of symptoms." (R. 53). The medical record from that period, however, does not bear her out. She made just seven visits to the doctor from 1991 through 1995 (less than 2 per year on average), and on the last three of those occasions, she had no respiratory problems. *Supra*, at 4. Moreover, she made no doctor visits in 1996. She said she had to start using an inhaler in 1998, but that was three years after her insured status expired. (R. 48).

Despite her alleged constant coughing, wheezing, and flu-like symptoms, she continued to smoke habitually throughout this period. (R. 52). She conceded that this was against her doctors' instructions, but she explained that she never attempted to quit because she didn't think her doctors' instructions were any more significant than the Surgeon General's warnings. (R. 52).

Ms. Cadenhead then testified as to her duties at her pizzeria, and she was somewhat elusive on this topic as well. (R. 97). She said she opened the business in 1994, and that from the time it

8

began it was "actually closed as much as . . . open because [she] was physically unable to do it." (R. 59). Yet, she also conceded that they were open for six days a week for while, and then cut that back to five. (R. 60). She would come in mornings at about ten o'clock and work until two o'clock, then return in the evening. (R. 59). Sometimes her husband would close up at night, but he generally did *not* help with the business at *all*. (R. 60-61).

She had neighborhood people who worked for her, and her son began working for her in 1999 or 2000. (R. 60). Even so, there was never more than one other person working at the establishment. (R. 96). Ms. Cadenhead explained that she kept the records and the books, mixed the batter, and handled phone orders. (R. 61). Mixing the batter involved measuring ingredients and pouring them into a mixing machine. (R. 62). She kept track of the inventory, ordering ingredients, produce, supplies, and the like. (R. 94). She later contradicted this testimony, stating that an employee did all the cooking, handled the cash, and took the phone orders. (R. 97). She explained that she ordered supplies through "a fellow in the neighborhood . . . [who] did the shopping for me everyday . . . through food distributors." (R. 93).

She could not say definitively how much she worked in a week because "it . . . always varied. . . . there was no given week that [she] was there, for instance, from nine to five." (R. 66). But she added that "at times, [she] would put in as much as 60 hours a week." (R. 70). Other times, it might be a little as ten hours a week – she said that was the norm. (R. 70). She didn't know how much time she spent walking in a given workday, perhaps half of the time. (R. 71). She said she never really just stood. (R. 75).

Her work as a contract manager at the University of Chicago – a job she held through the 1980s, and into the early 1990s – didn't involve much physical labor. (R. 79-80). She would only

9

have to lift things such as files and folders – never more than five pounds. (R. 80). From time to time her duties included supervising other workers in the office. (R. 81). She spent most of her time sitting. (R. 81). While she was working, she took college architecture courses and a real estate class. (R. 80, 82-83). She left the job because the family no longer needs the extra money for their sons' tuition. (R. 81). She was bored not working and started the pizzeria. (R. 82). She said she chose that because people told her she was a great cook (R. 82). She testified she did not do the cooking at the business, however. (R. 96-97).

At the remand hearing on July 22, 2003, Ms. Cadenhead testified in response to the VE's questions. (R. 420). This time, she said she spent only about an hour a week performing tasks in 1995 such as bookkeeping, phone work, and ordering supplies and equipment, and just two hours a week preparing recipes for gumbo, chili and cookies. (R. 468). Of course, this is a far cry from her previous testimony that she was working between ten and sixty hours a week. She also added that she would often have to stop in the middle of a task to rest. (R. 469). She explained that she might have to rest for an hour after working just a half hour, and said that it took her three hours to bathe. (R. 470). She said this was due to her problems breathing (R. 469) – a facet of her days running the pizzeria she did not mention at the initial hearing. She also flip-flopped once more on whether she was involved in any cooking; she said she would generally come in early to bake cookies and cook things like chili and gumbo. (R. 470).

## 2.
### The Testimony of the Plaintiff's Husband and Son

John Cadenhead, Ms. Cadenhead's husband, testified at the October 2003 hearing. When considered with Ms. Cadenhead's testimony, their testimony did not do much to clarify how much

10

work Ms. Cadenhead was doing at the pizzeria prior to December 1995. Mr. Cadenhead testified that the pizza business began in 1992 or 1993. (R. 511). He said Mrs. Cadenhead had quit her work at the university because she was tired (R. 511) – thereby contradicting his wife's testimony that it began in 1994. At the pizzeria, his wife would attempt to prepare pizzas and cookies or take orders but it was draining her and each day was harder. (R. 508). He said she had help – their sons and relatives. (R. 508). Mr. Cadenhead allowed that he never went to the restaurant. (R. 512). His wife worked less after December 31, 1995 than she did prior to this date. (R. 509). He testified that her principal problems consisted of lifting, breathing in general, and weight loss. (R. 510). He saw her gasping on one occasion. (R. 510).

Mr. Cadenhead said their son Lance didn't help out much in 1994, but in 1995, "he almost took it over because she couldn't hardly do anything." (R. 513). Recall, however, that Ms. Cadenhead stated that her son did not start working there until 1999 or 2000. Mr. Cadenhead stated that he would do the shopping for supplies. (R. 517-18). Their other son, Eric, would also help out whenever he could; he mainly went shopping for supplies almost daily because his wife "was doing a bunch of things." (R. 514). Again, this is different than his wife's version; she said she ordered supplies through "a fellow in the neighborhood" who worked with food distributors. And a short while later in Mr. Cadenhead's testimony, he clarified that, in 1994 and 1995, his sons weren't there to help. (R. 520).

Mr. Cadenhead said the workday would begin at 6 or 7 a.m. with preparation and shopping. He said "we" would get to the pizzeria at 7 or 8 a.m. and open at 11 a.m. (R. 516). His wife would prepare pizza dough in bulk so that she would have it ready for when she wasn't there. (R. 519). She also cooked the meat, broke it up, drained it, and seasoned it. (R. 523). Contrary to his wife's

11

testimony, he said she prepared the dough by hand: "[w]e didn't have no machines like you'd put them in – they got someplace, [where] you can just put dough in there." (R. 523). Mr. Cadenhead testified that his wife had to go to the emergency room once a year. (R. 527). As noted in connection with Ms. Cadenhead's testimony, however, the medical record says otherwise.

Lance Cadenhead, the Cadenhead's son, testified that he was out of town when the business began; he guessed it might have been in 1992 or 1993. (R. 537). He said that the business was open 6 days a week from about 11:00 a.m. until 10:00 or 11:00 p.m. (R. 538). He helped out as much as he could because it was a "family business" that "takes on a large scope of work." (R. 538). In 1995, he said he was just "pitching in." (R. 539). He helped out "whenever he could." (R. 542). But, at the same time, he testified he was there 70% of the time. (R. 539). This amounted to about 40 hours a week; sometimes more, sometimes less. (R. 540).

Lance testified that his mother demonstrated weakness, shortness of breath, dizziness, and confusion in 1995. (R. 543). He said that there were times when she would be unable to go to the restaurant for long periods of time due to illness. (R. 543-44). When this happened, he would go in and open the restaurant, but this was after 1995. (R. 543-44).

Lance then testified that his mother did not assemble cookie dough and pizza crust everyday, but froze it and used it as needed. (R. 547). He said that she assembled the dough and the cookies, and was the only one who knew recipes to certain items and when she was unable to prepare these things, they just wouldn't get made. (R. 551). The crust was the hardest thing to do; he wasn't doing that until 1998 or so. (R. 548). She did the bookkeeping as well. (R. 554). He testified that, in 1995, the "business was pretty much starting" and his "mom had a lot of control over what was going on in the restaurant." (R. 550).

Following the testimony of her husband and son, Ms. Cadenhead wanted to "clarify some stuff." (R. 555). She indicated that the business did not open until 1994. (R. 558). She thought she

might have gone to the emergency room once or twice in 1994-95, for migraine headaches. (R. 560).

## 3.
## The Medical Experts' Testimony

At the first hearing, Dr. Zitman testified as a medical expert. After reviewing the medical record and listening to Ms. Cadenhead's testimony, he indicated that the medical evidence was insufficient to establish she was disabled prior to December 1995. (R. 40). Dr. Zitman explained that she definitely had emphysema by 1995, but it was his opinion, based on the record and his experience, that her emphysema impairment wasn't severe until after her insured status expired, and became severe enough to meet the listings, perhaps six months prior to her first pulmonary function study in February 1998. (R. 83- 84). He thought that at the time, she would not have been capable of performing anything more demanding than light work. (R. 84).

Dr. Buckingham testified as ME at the remand hearing. He said that chronic obstructive pulmonary disease ("COPD") and emphysema were interchangeable terms; if a person has COPD, she has emphysema, and vice versa. (R. 441-42). That's not entirely accurate, it would seem, because a person could have chronic bronchitis, meaning they had COPD, and not have emphysema. http://www.nhlbi.nih.gov/health/dci/Diseases/Copd/Copd_WhatIs.html. Of course, he stated that Ms. Cadenhead's emphysema met the listings in 1998. (R. 443-44). He then testified that, based on his experience and the progression of pulmonary disease, the impairment was severe and would have met the listings in 1995. (R. 449). His opinion was that "it probably did go back 10 years . . . but it also went back, it was that way six months ago or it was abnormal, wether it was a point a little bit above or below, doesn't make a difference." (R. 460). He emphasized that it was a progressive disease, always "relentlessly" getting worse. (R. 448, 461). But, paradoxically, he

testified that the severity of the disease and the symptomatology would have been at the *same level* six months prior to the testing in 1998, or one year prior, or eighteen months prior, or two years prior, or even ten years prior. (R. 461). Despite the disease's relentless progression, he asserted that, if a pulmonary function study had been performed in 1995, it could have had the same results as the one performed in 1998. (R. 462).

#### 4.
#### The Vocational Expert's Testimony

Grace Gianforte testified as the vocational expert ("VE") at the initial hearing and at the remand hearing. At the first hearing, she said that Ms. Cadenhead's past relevant work as a contracts manager was skilled sedentary work. (R. 105). As for Ms. Cadenhead's duties at her pizzeria, Ms. Gianforte said – not surprisingly, given Ms. Cadenhead's varying descriptions – that it was difficult to evaluate (R. 105). If she were to rely on the work background, the job summary, and the disability report Ms. Cadenhead filled out in connection with her application for benefits, it would appear that the work was full-time and that it was substantial gainful activity ("SGA"). (R. 105). She explained that there are a variety of tasks involved in owning a business and operating it successfully and the business appeared to have generated substantial income. (R. 105). But, she also noted that Ms. Cadenhead's testimony made it sound like it wasn't SGA. (R. 105). Nevertheless, Ms. Gianforte opined that the work at the pizzeria was skilled, sedentary work. (R. 106). When asked whether Ms. Cadenhead could perform her past relevant work prior to January 1, 1996, the VE said that, Ms. Cadenhead could perform this work based on the record, but not if the determination were based on Ms. Cadenhead's testimony. (R. 108).

The ALJ asked whether an individual with Ms. Cadenhead's age, background, and education with the ability to lift 10 and 20 pounds frequently and occasionally, to sit six hours of an eight-hour

day and stand and walk six to eight hours of an eight-hour day, but with environmental restrictions could perform Ms. Cadenehad's past work. (R. 108). Ms. Gianforte said that she could. (R. 108). The ALJ then changed the hypothetical, increasing the restriction to sedentary work; Ms. Gianforte said that such a person would be capable of performing Ms. Cadenhead's past work as well. (R. 108).

When Ms. Cadenhead's attorney asked Ms. Gianforte if a person who couldn't work 32 hours could perform Ms. Cadenhead's past work, she said that if a person can't meet the 32-hour level, the work would not be considered full-time. (R. 109). Finally, the ALJ asked whether an individual engaged in a "Mom and Pop" operation would generally perform their work on a 32-hour-per-week fixed schedule or whether the time frame would vary. (R. 109). Ms. Gianforte responded that it would be difficult to answer the question completely, but as to her experience and understanding of self-employment, the early years are demanding and require long hours and extended effort, but once the business is considered successful, these things may be delegated to others. (R. 110).

Ms. Gianforte appeared once again at the hearing held in July 2003. The ALJ asked her if she was familiar with regulations related to self-employed SGA and its requirements and/or definition as distinguished from the work-place employee and activities as employee of a third party. (R. 454-55). She said she wasn't. (R. 455). Consequently, the ALJ dispensed with questioning her further. (R. 471).

### D.
### The ALJ's Decision

Initially, the ALJ recited the Appeals Council's instructions in its remand order vacating his previous decision: re-evaluate the finding that Ms. Cadenhead did not have a severe impairment prior

15

to the expiration of her insured status; re-evaluate Dr. McLeod's opinion, clarifying whether he is a treating, examining, or non-examining source to explain the weight accorded his opinion and re-contacting him if necessary for rationale for his opinion; and receive supplemental evidence from a medical expert (preferably a pulmonary specialist). (R. 312, 327). The ALJ determined that Dr. McLeod did not examine Ms. Cadenhead until 1998, and noted that he was a pulmonary specialist. (R. 312). When contacted for further information, Dr. McLeod said he had nothing to add to the reports already in the medical record. (R. 312).

The ALJ explained that, as his previous decision had been vacated and remanded, he had to render a decision *de novo*, citing 20 C.F.R. §§404.977, 404.983. (R. 313). He further explained that disability had to be established prior to the expiration of Ms. Cadenhead's insured status in December 1995. (R. 313).

He then recounted the evidence. He discussed the demands of her past work running her take-out pizza place, considering her testimony and that of her husband and son, as well as a third-party statement. (R. 315). The ALJ noted some inconsistencies as to just what plaintiff did at the restaurant, and that the business's record were less than thorough. (R. 315-16). He did note, however, that despite operating losses, the business had increasing revenue over the years 1995-98 – over $75,000 each year. (R. 316). Although there were considerable expenses deducted, testimony indicated that no substantial equipment purchases were made nor wages or salary paid during that time. (R. 317). And this was during a period where Ms. Cadenhead testified that the business was often closed due to her condition. (R. 317). Based on all this, the ALJ determined that Ms. Cadenhead failed to prove she was not engaging in substantial gainful activity ("SGA") through the expiration of her insured status, meaning she was not disabled. (R. 317).

16

Nevertheless, the ALJ soldiered on through the analysis, rendering an alternate decision. He reviewed the medical evidence, discussing her treatment and her doctor's evaluations of her impairment. (R. 318-20). He reviewed Dr. McLeod's notes and opinions, as well as the opinion Dr. Currie provided and the testimony of the medical experts at the administrative hearings. (R. 320). In the body of his decision, the ALJ stated that Ms. Cadenhead's emphysema constituted a severe impairment, but did not meet the Listings of Impairments – which would mean she was presumptively disabled – prior to her date last insured. (R. 321-22). At the same time, in his findings concluding his opinion, the ALJ stated she *did not* have a severe impairment during the relevant period – which would mean she was not disabled and the ALJ could end his analysis. He also found her impairment did not meet the listings in his findings, consistent with the body of the opinion. (R. 324).

Returning to the body of the opinion, the ALJ indicated he would continue through the analysis, rendering a further, alternate decision – which tends to suggest that he actually did mean to find Ms. Cadenhead had no severe impairment. (R. 322). He considered whether Ms. Cadenhead's impairment prevented her from performing her past relevant work prior to December 1995. (R. 322). He considered not only the medical record from that period and medical opinions, but Ms. Cadenhead's testimony as to her symptoms and their limiting effects on her. (R. 323). He said he was "troubled" by the fact that, at a time when she was supposedly disabled, she had started her own business and had ran it for a few years. (R. 323). He also thought that her course of treatment – or lack thereof – and minimal complaints during that period tended to undermine her credibility. (R. 323). The ALJ determined that her allegations as to her symptoms at the time were "less than fully credible." (R. 323). He concluded that, prior to the expiration of her insured status,

17

she had the capacity to lift and carry ten pounds, sit six hours a day, stand two hours, and walk two hours. (R. 323). He compared that to the demands of Ms. Cadenhead's job as a contract manager as she described them: seven hours of sitting, and a quarter hour each of walking, standing, stooping, and climbing, and found that she could have performed that work prior her date last insured. (R. 323-24). He acknowledged that the medical evidence subsequent to the expiration of Ms. Cadenhead's insured status "reflect[ed] medical conditions that have a profound and significant impact on her health and ability to sustain work on a current basis." (R. 324). But, prior to the expiration of her insured status, she was not disabled under that Act. (R. 324, 325).

## IV.
## DISCUSSION

### A.
### The Standard of Review

The applicable standard of review of the Commissioner's decision is a familiar one. The court must affirm the decision if it is supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is such relevant evidence as a reasonable mind might accept to support a conclusion. *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008), *citing Richardson v. Perales*, 402 U.S. 389, 401 (1971). The court may not reweigh the evidence, or substitute its judgment for that of the Social Security Administration. *Berger*, 516 F.3d at 544; *Binion on Behalf of Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997). Where conflicting evidence would allow reasonable minds to differ as to whether the plaintiff is disabled, the Commissioner has the responsibility for resolving those conflicts. *Binion*, 108 F.3d at 782. Conclusions of law are not entitled to such deference, however, so where the Commissioner commits an error of law, the court must reverse the decision regardless of the volume of evidence supporting the factual findings. *Schmidt v. Astrue*,

496 F.3d 833, 841 (7th Cir. 2007).

While the standard of review is deferential, the court cannot act as a mere "rubber stamp" for the Commissioner's decision. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). In order for the court to affirm a denial of benefits, the ALJ must "minimally articulate" the reasons for her decision. *Berger*, 516 F.3d at 544; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). This means that the ALJ "must build an accurate and logical bridge from [the] evidence to [the] conclusion." *Dixon*, 270 F.3d at 1176; *Giles ex rel. Giles v. Astrue*, 483 F.3d 483, 486 (7th Cir. 2007). Although the ALJ need not address every piece of evidence, the ALJ cannot limit his discussion to only that evidence that supports his ultimate conclusion. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). The ALJ's decision must allow the court to assess the validity of his findings and afford the plaintiff a meaningful judicial review. *Scott*, 297 F.3d at 595. In other words, as with any well-reasoned decision, the ALJ must rest a denial of benefits on adequate evidence contained in the record and must explain why contrary evidence does not persuade. *Berger*, 516 F.3d at 544; *Eichstadt v. Astrue*, 534 F.3d 663, 665-66 (7th Cir. 2008).

## B.
## Five-Step Sequential Analysis

Section 423(d)(1) defines "disability" as an: "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Heckler v. Day*, 467 U.S. 104, 107 n.1 (1984); *Skinner v. Astrue*, 478 F.3d 836, 844 (7th Cir. 2007). The Social Security Regulations provide a five-step sequential inquiry to determine whether a plaintiff is disabled:

1) is the plaintiff currently unemployed;

2) does the plaintiff have a severe impairment;

3) does the plaintiff have an impairment that meets or equals one of the impairments listed as disabling in the Commissioner's regulations;

4) is the plaintiff unable to perform his past relevant work; and

5) is the plaintiff is unable to perform any other work in the national economy.

20 C.F.R. §§ 404.1520; *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351-52 (7th Cir. 2005); *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004). An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the plaintiff is disabled. 20 C.F.R. §416.920; *Briscoe*, 425 F.3d at 352; *Stein v. Sullivan*, 892 F.2d 43, 44 (7th Cir. 1989). A negative answer at any point, other than step 3, stops the inquiry and leads to a determination that the plaintiff is not disabled. 20 C.F.R. §404.1520; *Stein*, 892 F.2d at 44. The plaintiff bears the burden of proof through step four; if it is met, the burden shifts to the Commissioner at step five. *Briscoe*, 425 F.3d at 352. In this case, the ALJ made alternate findings, initially finding Ms. Cadenhead disabled at step one, but continuing the analysis and finding her disabled at step two, and continuing once more, ultimately finding her disabled at step for as well.

## C.
### Analysis

Ms. Cadenhead has a host of problems with the ALJ's opinion. First, she contends that the ALJ violated the law of the case by finding she was performing SGA which disqualified her from entitlement to benefits. Moreover, she asserts that the ALJ did not even properly analyze that issue. Second, she complains that the ALJ made contradictory finding as to whether she had a severe impairment. Third, she argues that the ALJ improperly determined her impairment did not meet a

listing. Fourth, she takes the ALJ to task for not according proper weight to the opinion of Dr. McLeod, a pulmonary specialist and examining source. Fifth, she contends that the ALJ's credibility finding was improper. And, finally, she submits that the ALJ failed to follow the applicable law when determining whether she could perform, her past work. When the ALJ's decision is examined in light of the record, it cannot be said that it is not supported by substantial evidence. Hence, it must be affirmed.

## 1.
### Any Error The ALJ May Have Committed At Step One – Or, For That Matter, At Step Two – Was Harmless

Ms. Cadenhead argues that the ALJ violated the law of the case by re-examining the issue of whether she was engaged in SGA during the relevant period. She submits that, because the ALJ previously determined she was not, he was bound by his ruling because he was not ordered to revisit the question on remand. That's not exactly how law of the case works, but it is really of no consequence, because the ALJ went forward in the sequential evaluation and made alternate findings that Ms. Cadenhead was not disabled at steps two and four.

The law of the case doctrine generally provides that "'once an appellate court either expressly or by necessary implication decides an issue, the decision will be binding upon all subsequent proceedings in the same case.'" *Zamora-Mallari v. Mukasey,* 514 F.3d 679, 695 (7th Cir. 2008)(quoting *Key v. Sullivan,* 925 F.2d 1056, 1060 (7th Cir. 1991)). The doctrine applies to administrative proceedings. *Zamara-Mallari,* 514 F.3d at 695; *Zhang v. Gonzales,* 434 F.3d 993, 998 (7th Cir. 2006). In the administrative context, it requires the administrative agency, on remand from a court, to conform its further proceedings in the case in accord with the principles in the judicial decision, unless there is a compelling reason to depart. *Wilder v. Apfel,* 153 F.3d 799, 803

(7th Cir. 1998).

The first time around, the ALJ found that Ms. Cadenhead had not been engaging in SGA prior to the expiration of her insured status. It's unclear weather he had the same evidence before him that led him to change his mind on that point the second time around, but no matter. The doctrine of law of the case is not a straitjacket. *Avitia v. Metropolitan Club of Chicago, Inc.*, 49 F.3d 1219, 1227 (7th Cir. 1995). It is at its least rigid when a judge is reconsidering his own previous ruling. *Id.*; *Pickett v. Prince*, 207 F.3d 402, 407 (7th Cir. 2000). New evidence or not, when the ALJ took another look at the record, he thought he had been wrong about SGA, or maybe that he had not given it sufficient attention. So he corrected what he thought had been a mistake.

Moreover, he was not necessarily constrained by the stipulated remand. When the parties stipulated to a remand of his first decision, no reference was made to the SGA finding, but the parties did specify that the ALJ re-evaluate his determination that Ms. Cadenhead had no severe impairment. Arguably, that could imply that the ALJ had to get to that step – meaning that he would have to again find that Ms. Cadenhead was not performing SGA. But that is only arguable, and it doesn't rule out the ALJ going the alternate finding route, as he ultimately did.

Moreover, the court made no findings in the remand order, and issued no instructions regarding SGA. In *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345 (7th Cir. 2005), the court found that the law of the case doctrine precluded the ALJ from determining, a second time, that the plaintiff's testimony was not credible because it was not supported by the medical evidence because the court had specifically rejected that finding in its remand order. 425 F.3d at 324. As there were no specific findings or instructions from the court hindering the ALJ on remand here, the law of the case did not preclude him from re-examining the issue of SGA after his original decision was

vacated and remanded. *See also Exxon Corp. v. United States,* 931 F.2d 874, 877-78 (Fed.Cir.1991)(". . . trial judge is not bound by his or her own prior rulings, if they have not been adopted by an appellate court.").

But, again, it makes no difference here because the ALJ continued on in the sequential analysis. This was a perfectly acceptable course for him to have taken, and because he did, if he erred in not adhering to the law of the case, it was harmless error. The same goes for his determination that Ms. Cadenhead did not have a severe impairment, because he continued on to also find she could perform her past work. *Keys v. Barnhart,* 347 F.3d 990, 994 (7th Cir.2003)(". . . even if the ALJ erred in finding plaintiff's impairments non-severe at step two, the error is harmless given the ALJ's alternate finding-based on the SSA consultants' reports and the VE's testimony-that plaintiff could perform various jobs existing in significant numbers in the economy."); *Tommasetti v. Astruem,* 533 F.3d 1035, 1042 (9th Cir. 2008)(any error ALJ may have made at step four in the sequential evaluation was harmless because he made alternate finding at step five); *Peabody Coal Co. v. Director, Office of Workers' Compensation Programs,* 165 F.3d 1126, 1128 (7th Cir. 1999)(error does not warrant reversal when ALJ makes alternative finding).

## 2.
## The ALJ Properly Considered The Medical Opinions In Determining Whether Plaintiff Met The Listing of Impairments

Unlike his findings at steps one and two, the ALJ's finding at step three cannot be written off as harmless error if it was improper. If Ms. Cadenhead's condition meets the listings, she is disabled, and the analysis is at an end. The monkey wrench in this particular case is that there is no evidence suggesting she met the listings prior to the expiration of her insured status in December

1995. In fact, the evidence prior to that date gives no indication that Ms. Cadenhead is disabled. She sought treatment once or perhaps twice a year for wheezing and coughing, or a sore throat, or headaches. On most of those occasions, her chest was clear. When seeing her doctors, she voiced no respiratory complaints from June 1993 until January 1996, when her emphysema was – supposedly – disabling. Also around the time she contends her emphysema became disabling, she started her own pizzeria. It was not until a little over two years later that she was diagnosed with "mild emphysema." (R. 276). And it was not until February of 1998 that she underwent a pulmonary function study that met the listings. Given this, it was understandable the ALJ would think her impairment was not severe during this time, let alone that it did not meet the listings.

Trying to figure out whether an impairment met a listing retroactively makes these difficult cases for ALJs. In *Wilder v. Apfel*, 153 F.3d 799 (7th Cir.1998), the Seventh Circuit said "what is required is contemporaneous corroboration of the . . . illness, . . . [but] not necessarily contemporaneous *medical* corroboration." 153 F.3d at 802; *see also Liskowitz v. Astrue*, 559 F.3d 736, 742 (7th Cir. 2009)("A retrospective diagnosis may be considered only if it is corroborated by evidence contemporaneous with the eligible period."). The contemporaneous evidence here does not establish an impairment of listing level severity prior to December 1995. Ms. Cadenhead was only very sporadically seeking medical treatment, and even then, for relatively mild complaints that were generally not respiratory related. Her treating physicians certainly didn't feel she was disabled and, it would seem, neither did she, as she was running her own pizza place and, according to some of her testimony, doing just about everything involved and working between ten and sixty hours a week. Little wonder the ALJ was "troubled" about her veracity and credibility. But that is not all the ALJ had to consider.

In *Allord v. Barnhart*, 455 F.3d 818 (7th Cir. 2006), the Seventh Circuit remarked that "[a] disease might have a well-understood progression, so that a physician examining a patient at time *t* might have a good idea of what the patient's condition had been at time *t-n,* where *n* was the number of years, prior to the examination, by which time the patient would have had to be completely disabled to be entitled to benefits." 455 F.3d at 822 n.1. Here, there were three medical opinions for the ALJ to consider: Dr. Zitman, an internist who testified at the first hearing; Dr. Buckingham, who testified at the second hearing, and Dr. McLeod, who examined Ms. Cadenhead in May 1998.[2] Dr. Zitman felt Ms. Cadenhead's impairment wasn't severe until after her insured status expired, and became severe enough to meet the listings perhaps six months prior to her first pulmonary function study in February 1998. (R. 84). Dr. Buckingham, who testified on remand, speculated that "the severity of the impairment could have been the same" in 1995, and thought it "would be likely" that a pulmonary function study performed in 1995 would have the same result as the one performed three years later in 1998. (R. 462). And Dr. McLeod, who examined Ms. Cadenhead in May 1998, reported in 2001 that she would have met the listings in 1995. (R. 301).

The ALJ considered these opinions, and went with Dr. Zitman's. Not surprisingly, Ms. Cadenhead has a problem with that. She says he "improperly ignore[d]" the opinions of Drs. Buckingham and McLeod. The ALJ did no such thing. In fact, he discussed them thoroughly. (R. 320-22). He may not have interpreted Dr. Buckingham's opinion the same way Ms. Cadenhead did (*Plaintiff's Memorandum in Support of Motion for Summary Judgment*, at 23), but this is understandable. Ms. Cadenhead interprets the opinion as being as definitive as Dr. McLeod's; it

---

[2] There was a fourth opinion – that of Dr. Currie – but it was substantially based on Ms. Cadenhead's back injury (R. 406-13), which did not occur until the second half of 2000. (R. 272). As this was five years after the expiration of her insured status, it plays no role in this calculus.

wasn't, it was filled qualifiers like "could have," "would be likely," and others. See, *supra* at 13-14.

His level of certainty paled in comparison to that of Dr. McLeod, who had no doubt Ms. Cadenhead

met the listings in 1995. But even though the ALJ did not interpret Dr. Buckingham's opinion as

being as definite as Dr. McLeod's, he nevertheless grouped it alongside Dr. McLeod's as conflicting

with Dr. Zitman's. So Ms. Cadenhead's complaint that the ALJ "misstated" Dr. Buckingham's

opinion is, essentially, "nitpicking." *Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004)(counseling

courts to give ALJ's opinions a commonsensical reading rather than nitpicking at them); *Shramek

v. Apfel,* 226 F.3d 809, 811 (7th Cir.2000) (same); *Johnson v. Apfel*, 189 F.3d 561, 564 (7th

Cir.1999)(same).

Ms. Cadenhead also asserts that the ALJ didn't consider the factors set out in 20

C.F.R.§404.1527 in rejecting the opinion of Dr. McLeod. That regulation sets forth the "treating

source rule," as well as the criteria under which an ALJ must evaluate all medical opinions. The

Seventh Circuit has discussed the regulation at length many times and has made clear that the

supposed "rule" does not automatically disqualify all opinions save those of the treating physician.

In fact, the cases make clear that while the treating physician's opinion is important, it is not the final

word on a claimant's disability. *Books v. Chater,* 91 F.3d 972, 979 (7th Cir. 1996).

The cases recognize the indisputable reality that there may be an element of bias in the

assessment of the treating physician, who "'may want to do a favor for a friend and client, and so the

treating physician may too quickly find disability.' " *Id. See also Hofslien v. Barnhart,* 439 F.3d

375, 377 (7th Cir.2006) ("the fact that the claimant is the treating physician's patient also detracts

from the weight of that physician's testimony, since, as is well known, many physicians (including

those most likely to attract patients who are thinking of seeking disability benefits) will often bend

over backwards to assist a patient in obtaining benefits," and therefore "the weight properly to be given to testimony or other evidence of a treating physician depends on circumstances"); *Schmidt v. Astrue,* 496 F.3d 833, 842 (7th Cir.2007); *DeFrancesco v. Bowen,* 867 F.2d 1040, 1043 (7th Cir.1989)(criticizing Allen for not recognizing potential bias of treating physician).

The Seventh Circuit has expressed a bit of puzzlement about the rule, because

> if [the treating physician's medical opinion] is well supported and there is no contradictory evidence, there is no basis on which the administrative law judge, who is not a physician, could refuse to accept it. Equally obviously, once well-supported contradicting evidence is introduced, the treating physician's evidence is no longer entitled to controlling weight. . . . [At that point], "the treating physician's evidence is just one more piece of evidence for the administrative law judge to weigh . . . .

*Hofslien,* 439 F.3d at 376. Simply put, the rule requires the ALJ to accord controlling weight to the medical opinion of a treating physician *if* it is "'well-supported by medically acceptable clinical and laboratory diagnostic techniques'" *and* "'not inconsistent with the other substantial evidence.'" *Hofslien v. Barnhart,* 439 F.3d 375, 376 (7th Cir.2006); *see also Moss v. Astrue,* 555F.3d 556, 561 (7th Cir. 2009)("If an ALJ does not give a treating physician's opinion controlling weight, the regulations require the ALJ to consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion.").

The rule also provides some criteria for an ALJ to use when weighing a treating source's opinion, such as how often the treating physician has examined the claimant, whether the physician is a specialist in the condition claimed to be disabling, the degree to which the source supports the opinion with evidence, its consistency, and so forth. 20 C.F.R. §404.1527(d)(2); *Hofslien,* 439 F.3d at 376. Dr. McLeod is an examining source, rather than a treating source, so his opinion is not

entitled to as much weight as that of a treating source. 20 C.F.R. §404.1527(d)(1). Non-examining sources, like Drs. Buckingham and Zitman, are a bit further down in the hierarchy. 20 C.F.R. §404.1527(f). But the criteria for attributing weight to the various opinions are applicable to all sources. 20 C.F.R. §404.1520(d);(f).

The ALJ applied the applicable criteria here. In the case of Dr. McLeod, he noted the doctor was a pulmonary specialist, and that he examined, but did not treat, Ms. Cadenhead, and did not examine her until over two years after the expiration of her insured status. (R. 320). Upon that examination, Dr. McLeod characterized Ms. Cadenhead's breathing deficiency as having been mild for several years. (R. 320). Moreover, the ALJ noted that he did not render an opinion regarding her impairment's effect on her ability to work at the time of his examination, but did so a little over five years after her date last insured. (R. 320). At that time, he speculated that, as of her date last insured, she would have been restricted to a very limited range of sedentary work. (R. 320). And the ALJ pointed out that it was not until a further seven months after that, perhaps not coincidentally, until she had been found not disabled in the ALJ's prior decision, that Dr. McLeod offered his opinion that she would likely have met the listings in December 1995. (R. 320).[3]

So there is a problem with Dr. McLeod's opinion in terms of consistency – in more ways than one. First, and most obviously from the ALJ's review of Dr. McLeod's shifting assessment, his opinion is internally inconsistent with his own findings. His estimates regarding Ms. Cadenhead's condition in 1995 became more and more serious the farther removed from the relevant period they

---

[3] At one point, Ms. Cadenhead goes so far as to complain that Dr. Zitman failed to consider Dr. McLeod's opinion when he testified. (*Plaintiff's Memorandum in Support of Motion for Summary Judgment*, at 25). This is just more nitpicking on Ms. Cadenhead's part: Dr. McLeod's 2001 opinion was obviously not in the record when Dr. Zitman testified in December 2000.

were. In 1998, he said her shortness of breath would have been mild in 1995; in January 2001, he thought she could perform only a very limited range of sedentary work in 1995; and in August 2001, he opined that she would have been presumptively disabled in 1995. Dr. McLeod's opinion being internally inconsistent, the ALJ was justified in discounting or rejecting it. *See Schmidt v. Astrue,* 496 F.3d 833, 842-43 (7th Cir. 2007)(upholding ALJ decision to discount treating physician's opinion because earlier treatment notes were not as serious as later work-limitation recommendations); *see also Ketelboeter v. Astrue,* 550 F.3d 620, 625 (7th Cir. 2008); *White v. Barnhart,* 415 F.3d 654, 659 (7th Cir.2005); *Skarbek, v. Barnhart,* 390 F.3d 500, 503 (7th Cir. 2004).

The ALJ also assessed Dr. McLeod's opinion in the context of the evidence from the relevant period. (R. 322). As already discussed, it wasn't particularly serious: Ms. Cadenhead wasn't seeking treatment very often, and her complaints were fairly mild or had nothing to do with her breathing. In addition, at the time Dr. McLeod thought she would have been presumptively disabled, she was starting a take-out pizzeria with its exacting demands on her time and energy. Thus, an opinion that Ms. Cadenhead was completely disabled prior to December 1995 would be inconsistent with, not only the contemporaneous *medical* evidence, but other contemporaneous evidence as well. *See Liskowitz,* 559 F.3d at 742; *Allord,* 455 F.3d at 822; *Wilder,* 153 F.3d at 802. So again, inconsistency is a flaw in Dr. McLeod's opinion in this case, with the contemporaneous evidence, and that is a valid reason for the ALJ to have discounted Dr. McLeod's opinion. 20 C.F.R. § 404.1520(d)(4); *Elder v. Astrue,* 529 F.3d 408, 415 (7th Cir. 2008);*White v. Barnhart,* 415 F.3d 654, 658 (7th Cir.2005).

One further observation regarding the ALJ's assessment of Dr. McLeod's opinion: The ALJ quite properly was concerned with the manner in which Dr. McLeod's assessment of

Ms. Cadenhead's condition became more dire when disability benefits were at stake, and thus there was an obvious motive to exaggerate. When he was simply assessing the likely course of emphysema as a consultant, he thought she probably had mild shortness of breath in 1995. But, three years later, when he was asked to provide an opinion for the purposes of a disability benefits claim, he thought she was disabled in 1995.

As noted earlier, the Seventh Circuit has repeatedly remarked upon a treating physician's potential bias in rendering such opinions in their patient's favor and has stressed that this sort of testimonial motivation ought not be ignored by the ALJ. *Hofslien*, 439 F.3d at 377; *Schmidt*, 496 F.3d at 842 ("As we previously have noted, '[t]he patient's regular physician may want to do a favor for a friend and client, and so the treating physician may too quickly find disability.' "); *Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir.2001). While Dr. McLeod was not technically Ms. Cadenhead's treating physician, the rationale of these cases applies, and the shift in his assessment and the timing of that shift, are significant and are properly to be weighed in the analysis of credibility.

The ALJ considered Dr. Buckingham's opinion within the same framework; his opinion suffered from some of the same problems of lack of consistency. While it was not internally inconsistent in the same manner as Dr. Buckingham's, it was, as the ALJ seemed to suggest, somewhat equivocal – at least, less than definitive. And there was something of a contradiction within his testimony insofar as he said emphysema was "*relentlessly* progressive" and "only gets worse" (R. 448)(emphasis supplied), but also stated that it would be at the same severity level for ten years, albeit perhaps a "point a little bit above or below." (R. 460-62). That is not "relentlessly progressive." And Dr. Buckingham's opinion was also inconsistent with the medical record during

the pertinent period, as well as Ms. Cadenhead's complaints and activities at that time.

This is not to say that Dr. Zitman's opinion was flawless or that the ALJ had no choice but to adopt it. But neither were the other two opinions, and the problems with them detracted from their weight and made it perfectly acceptable for the ALJ to accept Dr. Zitman's assessment instead. It is the ALJ's responsibility to weigh the medical opinions and decide among them. *Haynes v. Barnhart*, 416 F.3d 621, 631 (7th Cir. 2005); *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004)("Weighing conflicting evidence from medical experts, however, is exactly what the ALJ is required to do."). "Faced with competing opinions, the ALJ had to decide which opinion to credit." *Liskowitz v. Astrue*, 559 F.3d 736, 742 (7th Cir. 2009); *Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996)(" . . . in the end, 'it is up to the ALJ to decide which doctor to believe . . . subject only to the requirement that the ALJ's decision be supported by substantial evidence.'"). That's what the ALJ did here, and he adequately provided the rationale for his selection. It matters not whether the plaintiff, or even the court, might have selected a different opinion. *Young*, 362 F.3d at 1001 (the court "may not re-weigh the evidence.").

### 3.
### The ALJ Properly Assessed Plaintiff's Credibility

Ms. Cadenhead also faults the ALJ's assessment of her credibility. She claims the ALJ failed to follow Social Security Ruling ("SSR") 96-7p, and rendered an unsupported "conclusory" credibility finding. But contrary to Ms. Cadenhead's assertion, the ALJ specifically said he was considering SSR 96-7p and 20 C.F.R. §404.1529. (R. 322-23). *See Schmidt v. Astrue*, 496 F.3d 833, 843-44 (7th Cir. 2007)(rejecting same argument, where ALJ stated he was considering the applicable ruling and regulation).

Moreover, the ALJ recounted her testimony at length, as well as the medical evidence and her course of treatment during the relevant period. He indicated that he compared her allegations to her treatment and objective medical evidence. Moreover, he discussed the contradictions between her activities at that time she contends she was completely disabled, and what one might reasonably expect such an individual to be capable of. Essentially, the ALJ here provided the same level of explanation and detail found perfectly acceptable in *Schmidt*:

> The ALJ . . . summarized Schmidt's testimony, in particular her assertions of pain and the limitations she claimed as a result of her impairments. After discussing Schmidt's testimony and the medical evidence in the record, the ALJ stated that Schmidt's "allegations of disabling pain and incapacitating limitations [were] not consistent with or supported by the objective medical record of treating and examining physicians," in addition to reiterating that "the objective findings do not support the level of chronic pain asserted by [Schmidt]." These conclusions were supported by evidence in the medical record indicating that Schmidt regularly exhibited normal neurological findings, strength, reflexes, and sensation. In short, the diagnostic evidence in Schmidt's medical records conflicts with testimony and claims of disabling pain.

*Schmidt,* 496 F.3d at 843-44. So the ALJ's assessment of Ms. Cadenhead's credibility was neither unsupported nor "conclusory"; he provided an acceptable rationale for his determination. *See Elder v. Astrue,* 529 F.3d 408, 413-14 (7th Cir. 2008)(holding that the "ALJ clearly provided a reason for his adverse credibility determination" where he stated that the plaintiff's allegations as to the severity of her symptoms conflicted with the medical record).

The more specific reasons Ms. Cadenhead offers for overturning the ALJ's adverse credibility assessment also have little traction. Generally, she contends that the ALJ should have "considered that [she] has medically determinable impairments that could be expected to cause her symptoms and that these were supported by her limitations in daily activities . . . [because] her

allegations of disabling symptoms and limitations are all reasonably related to her medically determinable diagnosis of emphysema." (*Plaintiff's Memorandum in Support of Motion for Summary Judgment*, at 27). So, as Ms. Cadenhead would have it, if there is a diagnosis of an impairment, say degenerative disc disease, and the plaintiff alleges that she is essentially paralyzed with pain and cannot move from a supine position, an ALJ must believe her, even if the medical record demonstrates her impairment is only a mild one and during the time she claims to have been disabled she did not complain to her doctors about her back and started her own business. Obviously, that's not how these things work.

A diagnosis is not necessarily a disability. *Gentle v. Barnhart*, 430 F.3d 865, 868 (7th Cir. 2005). What the law actually requires an ALJ to do is simply "*consider* a claimant's subjective complaints of pain if the claimant has a medically determined impairment that could reasonably be expected to produce that pain." *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008)(emphasis supplied). Here, the ALJ did just that, but, judging by other relevant factors from the time before Ms. Cadenhead's insured status expired, found them to be exaggerated.

Ms. Cadenhead's more specific criticisms of the ALJ's credibility are similarly misdirected. She lists a few or her allegations that she thinks prove she is entitled to benefits:

> In 1999 [Ms. Cadenhead] explained that she had to use her inhaler and rest while taking a bath or attempting to walk even a block. (R. 168). In a letter to Senator Durbin in January of 2000, [she] says that she cannot be outside when it is cold or damp and cannot stand for long without assistance. (R. 337). Again, she mentions that she is unable to walk a block without an inhaler. *Id.* These complaints are not inconsistent with the symptoms of emphysema but are, in fact, characteristic of someone who has been diagnosed with the disease.

(*Plaintiff's Memorandum in Support of Motion for Summary Judgment*, at 27).

Perhaps, but "these complaints" manifested some *five years* after Ms. Cadenhead's insured status expired. She has to prove she was disabled no later than 1995, not in 1999 or 2000. Apparently it cannot be stressed too often: Ms. Cadenhead has to establish she became disabled *before* the expiration of her insured status. *Liskowitz v. Astrue*, 559 F.3d 736, 740 (7th Cir. 2009); *Keith v. Barnhart*, 473 F.3d 782, 790 (7th Cir. 2007); *Briscoe*, 425 F.3d 345, 348 (7th Cir. 2005). Difficulty breathing in 2000 does not equate to disabling emphysema in 1995.[4] In short, there is no reason to overturn the ALJ's credibility finding, since it was supported by the record and is not "patently wrong." *Schmidt*, 496 F.3d at 843 (" . . . we will not disturb [the ALJ's] credibility determinations as long as they find some support in the record. . . . Accordingly, [w]e will reverse an ALJ's credibility determination only if the claimant can show it was patently wrong.")(internal quotations omitted).

**4.**

## The ALJ Followed The Applicable Law In Determining That The Plaintiff Could Perform Her Past Relevant Work

Finally, Ms. Cadenhead argues that the ALJ failed to follow SSRs 96-8p and 85-15 in determining she could perform her past relevant work. Ms. Cadenhead's argument in regard to SSR 96-8p – which requires an ALJ to determine a claimant's residual functional capacity ("RFC") or her "ability to do sustained work-related physical and mental activities in a work setting on a regular

---

[4]In this same vein, Ms. Cadenhead also chastises the ALJ for failing to consider a letter she wrote to him in 2003. In it, she said that she was sick as long ago as the 1980s – at a time when she was working full time for the University of Chicago and taking college courses. She added that before she was diagnosed with emphysema, she was sick "3 out of 4 weeks." She does not say how long before, it may have been after the expiration of her insured status. She then recounts some of her medical history from 1998 and 2000 – again, three and five years after the expiration of her insured status. (R. 387).

and continuing basis." *Liskowitz*, 559 F.3d at 744. A "regular and continuing basis" means 8 hours a day, for 5 days a week, or an equivalent work schedule." *Id.* Ms. Cadenhead submits that the ALJ failed to do this properly because he didn't take into consideration all of the limitations she claimed to have. But, these were simply her allegations. As has already been addressed at length, the ALJ discredited her testimony, and his rationale for doing is supported by substantial evidence in the record. When the ALJ formulates a RFC, he is not forced to bring in limitations a plaintiff alleges that he has found not credible; the limitations in his RFC formulation need only follow the limitations documented by the medical evidence. *Stewart v. Astrue*, 561 F.3d 679, 684 (7th Cir. 2009)(limitations in hypothetical to VE need only be based on medical evidence); *Elder v. Astrue*, 529 F.3d 408, 413-14 (7th Cir. 2008)(ALJ need not include alleged limitations in the RFC that conflict with the medical record).

The same can be said of Ms. Cadenhead's contention that the ALJ failed to follow SSR 85-15. That ruling requires an ALJ to "account for consider [a plaintiff]'s mental impairments . . . '[b]ecause response to the demands of work is highly individualized, the skill level of a position is not necessarily related to the difficulty an individual will have in meeting the demands of the job. A claimant's [mental] condition may make performance of an unskilled job as difficult as an objectively more demanding job.'" *Craft v. Astrue*, 539 F.3d 668, 677 (7th Cir. 2008)(quoting SSR 85-15). In her brief, Ms. Cadenhead says she has a mental impairment the ALJ failed to consider: her mental ability to perform skilled work declined with her health. (*Plaintiff's Memorandum in Support of Motion for Summary Judgment*, at 31). But the brief is the first mention of any reduced mental capacity. She didn't testify to any, and her brief does not cite any part of the record in which she alleges such a limitation or a doctor mentioned one. "A brief must make all arguments

accessible to the judges, rather than ask them to play archaeologist with the record." *DeSilva v. DiLeonardi*, 181 F.3d 865, 867 (7th Cir.1999). *See also Casna v. City of Loves Park*, 574 F.3d 420, 424 (7th Cir. 2009)("'Judges are not like pigs hunting for truffles buried in' the record.").

If Ms. Cadenhead means that the ALJ had to assume that, based on the portions of her testimony regarding how restricted she was physically, her mental capacity declined as well, then her argument must be rejected for the same reason her SSR 96-8p argument was. The ALJ properly discredited that testimony.

Finally, Ms. Cadenehad submits that the ALJ failed to compare the demands of her past work with her RFC. SSR 82-61 requires the ALJ to determine:

1. The actual functional demands in job duties of a particular past relevant job; *or*

2. The functional demands and job duties of the occupation as generally required by employers throughout the national economy.

SSR 82-61; *see also Arbogast v. Bowen*, 860 F.2d 1400, 1403 (7th Cir. 1988); *Steward v. Bowen*, 858 F.2d 1295, 1300 (7th Cir. 1988). Ms.Cadenhead provided a written statement and testimony as to the actual demands of her past work as a contracts manager. She described her overall responsibilities (R. 79), how much she had to lift (R. 80-81), the number of people she supervised (R. 81), and indicated that the job was performed mostly while sitting. (R. 81). In her brief, Ms. Cadenhead offers no clue as to what she failed to add in her written and oral description. It was perfectly acceptable for the ALJ to rely on her descriptions. *See Orlando v. Heckler*, 776 F.2d 209, 215 (7th Cir. 1985)(plaintiff's own description of job demands allowed ALJ to reach an informed conclusion as to what that work entailed). Moreover, the VE, who testified that Ms. Cadenhead could have returned to her past work prior to the expiration of her insured status, also considered Ms.

Cadenhead's statements and testimony. *Young v. Barnhart*, 362 F.3d 995, 1003 (7th Cir. 2004)(VE has knowledge of exhibits and testimony).

## V.

## CONCLUSION

There is no dispute that Ms. Cadenhead has emphysema, and that her condition met the listings in 1998, meaning she was disabled at that time. But that is not what this case is about. This case is about whether she was disabled prior to the expiration of her insured status December 31, 1995. She likely had emphysema at that time, but how serious was it? As already noted, just because an individual has an impairment that can be disabling, doesn't mean she's disabled. *Gentle*, 430 F.3d at 868. At that time she had recently opened her own pizzeria – according to her testimony, in 1994. She says her hours varied; she might put in 60 hours a week at her business, but never less than ten. For a person with a supposedly disabling pulmonary impairment, she was rarely going to the doctor during that period: seven times in five years. On half of those occasions – and from 1993 to 1996 – she had no complaints regarding any breathing difficulties. Her condition was not so severe that she felt it necessary to try to quit smoking, despite what her doctors told her. That's not questioning why she did not quit – obviously, that's a difficult task for many if not most – but why she didn't even *consider* it when her doctors recommended that she quit.

In short, the record pertaining to the period prior to December 31, 1995 simply does not depict a person who was disabled.[5] And that is the conclusion the ALJ reached after considering all

---

[5] Of course, Ms. Cadenhead might have applied for Supplemental Security Income, in which case her insured status – or lack thereof – would be irrelevant. She would, however, have had to established that she is of limited means. 42 U.S.C. §§ 1381a, 1382; *Liskowitz*, 559 F.3d at 740 n.2.

the testimony, medical evidence, and medical opinion. That conclusion is supported by substantial evidence and must be affirmed. The plaintiff's motion for summary judgment or remand is DENIED, and the Commissioner's motion for summary judgment is GRANTED.

**ENTERED:** _____
**UNITED STATES MAGISTRATE JUDGE**

**DATE:** 3/5/10